

**U.S. Department of Transportation** -

# News:

Office of the Assistant Secretary for Public Affairs
Washington, D.C. 20590

FOR IMMEDIATE RELEASE
Tuesday, January 12, 1993

NHTSA  02-93
Contact:    Skipp Calvert
            Barry McCahill
Tel. No.:   (202) 366-9550

NHTSA SAYS ODOMETER FRAUD
DOWN SHARPLY IN FORMERLY LEASED CARS

The percentage of formerly leased cars with odometers turned back before being sold to consumers is down dramatically, according to the National Highway Traffic Safety Administration (NHTSA).

NHTSA Administrator Marion C. Blakey said a recent study conducted for the agency found that "only 5 percent of the formerly leased vehicles showed evidence that the odometers had been turned back, compared to a rate of nearly 50 percent documented in a study done in 1985.

"That's the good news. But while we have made great progress against odometer fraud in formerly leased vehicles, criminals are now altering high-mileage trade-ins and repossessed cars. Before buying a used car, consumers should get an independent assessment of condition by a reputable mechanic to determine if it is consistent with the odometer mileage," Blakey said.

The study, by the Pennsylvania Attorney General's Bureau of Consumer Protection, concludes that the reduction in odometer fraud resulted from the passage of the 1986 Truth in Mileage Act and increased state and federal odometer fraud enforcement actions.

Blakey said that odometer records for two major leasing companies were subpoenaed for all vehicles sold in the first six months of 1991. The cars were then traced to all 50 states to see if the odometers were rolled back before resale.

Of the 3,630 vehicles traced, only 184 had odometers that were rolled back. The cars with altered odometers, however, had been rolled back an average of 53,123 miles, meaning that re-sale purchasers bought used cars that had been driven many more miles than the purchaser believed. They also paid more for the cars than they were worth.

Blakey said leased vehicles typically accumulate high mileage in a short period of time and are attractive candidates for odometer fraud because they can be refurbished cosmetically without great expense.

####



**DEPARTMENT OF TRANSPORTATION**
**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION**

## TECHNICAL SUMMARY

| CONTRACTOR   Pennsylvania Office of Attorney General Bureau of Consumer Protection, Ernest D. Preate, Jr. Attorney General | CONTRACT NUMBER DTNH22-92-P-01099 |
|---|---|

| REPORT TITLE   A Study &  Statistical Analysis of Odometer Tampering by Purchasers of One-Time Lease Vehicles | REPORT DATE December 1, 1992 |
|---|---|

REPORT AUTHOR(S)
John E. Kelly, Senior Deputy Attorney General

**BACKGROUND** – Odometer tampering is prohibited by both state and federal law. A 1985 study found that odometer tampering occurred with regard to approximately 50% of one-time lease vehicles.  Lease vehicles are attractive targets for odometer fraud because they usually accumulate high mileage over a relatively short time period.  There has been no research conducted updating the 1985 study.

**OBJECTIVES** – The primary objective was to determine the current level of odometer tampering in one-time lease vehicles.  A secondary objective was to replicate as closely as possible the 1985 study in order to compare results of the two studies.

**METHODOLOGY** – Odometer records of two major leasing companies were subpoenaed for all vehicles sold from January through June, 1991.  A portion of these vehicles were tracked into all 50 states in order to determine if their odometers were rolled back prior to resale to ultimate consumer purchasers.  Statistical data and conclusions were prepared.

**SIGNIFICANT RESULTS** – Based on an analysis of the leased vehicles resold by the two lease companies, the overall rollback rate was estimated to be 5.07%. Tampering rates by state ranged from 0% to 22%.  The average rollback was 53,123 miles.  The average consumer damage for each rollback was $6,653.  Based solely on the leasing company and states used in the 1985 study, the overall rollback rate was 3.91% versus the 50% rate found in the prior study.

**CONCLUSIONS** – The overall odometer tampering rate for vehicles after they are sold by leasing companies appears to have greatly decreased since 1985. This is probably the result of new federal legislation and increased federal and state criminal enforcement actions.  The federal legislation creates an evidentiary paper trail which government prosecutors and private civil attorneys can use.  Overall, the tampering problem is probably still greater than statistics for lease cars indicate, since clockers now concentrate on other types of used vehicles. A nationwide database of odometer readings that is readily available to the public which can be consulted prior to buying a vehicle, would greatly reduce odometer fraud.

(Continue on additional pages)

"PREPARED FOR THE DEPARTMENT OF TRANSPORTATION, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION UNDER CONTRACT NO.: DTNH22-92-P-01099.  THE OPINIONS, FINDINGS, AND CONCLUSIONS EXPRESSED IN THIS PUBLICATION ARE THOSE OF THE AUTHORS AND NOT NECESSARILY THOSE OF THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION."

HS Form 321
July 1974

**Technical Report Documentation Page**

| 1. Report No. | 2. Government Accession No. | 3. Recipient's Catalog No. |
|---|---|---|
| | | |
| **4. Title and Subtitle** A Study & Statistical Analysis of Odometer Tampering by Purchasers of One-Time Lease Vehicles | | **5. Report Date** December 1, 1992 |
| | | **6. Performing Organization Code** NEF-20 |
| **7. Author(s)** John E. Kelly, Senior Deputy Attorney General | | **8. Performing Organization Report No.** |
| **9. Performing Organization Name and Address** Pennsylvania Office of Attorney General, Bureau of Consumer Protection 21 S. 12th Street, Second Floor Philadelphia, PA 19107 | | **10. Work Unit No. (TRAIS)** |
| | | **11. Contract or Grant No.** DTNH22-92-P-01099 |
| **12. Sponsoring Agency Name and Address** United States Department of Transportation, National Highway Traffic Safety Administration, 400 7th Street, SW Washington, DC 20590 | | **13. Type of Report and Period Covered** Final Report |
| | | **14. Sponsoring Agency Code** NHTSA |

**15. Supplementary Notes**

COTR: Carolyn Felder, Odometer Fraud Staff, NEF-20, Washington, D.C. 20590

**16. Abstract**

The primary objective was to determine the current level of odometer tampering in one-time lease vehicles. A secondary objective was to replicate as closely as possible a similar 1985 study and to compare the results. Odometer readings at the time vehicles were sold by two major leasing companies were compared with the odometer readings of those same vehicles when they were later resold to ultimate consumer purchasers in order to determine if odometer tampering had occurred. Based on an analysis of the leased vehicles resold by the two lease companies the study estimated a 5.07% tampering rate for lease vehicles. A close replication of the 1985 study disclosed a 3.91% rollback rate versus the 50% rate found in the prior study. The report credits this apparent reduction to new legislation and increased criminal prosecutions. It recommends continued vigilance and creation of a nationwide odometer database.

| 17. Key Words | | 18. Distribution Statement |
|---|---|---|
| Odometer Tampering; Odometer Rollbacks; Lease Vehicles; Lease Cars | | |

| 19. Security Classif. (of this report) | 20. Security Classif. (of this page) | 21. No. of Pages | 22. Price |
|---|---|---|---|
| Unclassified | Unclassified | 27 | |

Form DOT F 1700.7 (8-72)          Reproduction of completed page authorized

This publication is distributed by the U.S. Department of Transportation, National Highway Traffic Safety Administration, in the interest of information exchange. The opinions, findings and conclusions expressed in this publication are those of the author(s) and not necessarily those of the Department of Transportation or the National Highway Traffic Safety Administration. The United States Government assumes no liability for its contents or use thereof. If trade or manufacturers' name or products are mentioned, it is because they are considered essential to the object of the publication and should not be construed as an endorsement. The United States Government does not endorse products or manufacturers.

## BACKGROUND

A 1985 study by the Illinois Attorney General documented that odometer tampering occurred with regard to approximately 50% of the lease cars which it tracked into twenty-three (23) states.  Following the Illinois study federal and state enforcement efforts were greatly increased.  In addition, the Federal Truth in Mileage Act of 1986 ("TIMA") now requires that all vehicle sellers put odometer readings on vehicle titles in connection with title transfers and that these odometer readings appear on titles issued to purchasers.  Given these increased enforcement efforts and legislative changes, some industry observers believe that odometer tampering is declining.  This conclusion is disputed by others who point out that since the average fleet car logs 32,000 miles per year and is driven thirty (30) months before being sold, [1] one would expect to see a large number of two to three model year old cars with 64,000 miles on used car lots.  Evidence suggests that most two model year old cars on dealer lots tend to have mileage in the thirty thousand rather than sixty thousand mile range. National Highway Traffic Safety Administration ("NHTSA") figures disclose that the typical rolled back vehicle which it investigates is two model years old with only 32,000 miles.

---

[1]  Automotive Fleet Fact Book (1990).

It has been the past experience of the Pennsylvania Bureau of Consumer Protection that a high percentage of one-time lease cars have their odometers rolled back.  Actually, with regard to vehicles with more than 99,999 miles, the leading digit of six digit odometers is rolled to zero, while in the case of five digit odometers, the odometer is rolled forward to a more desirable mileage which is lower than the original reading. Any method of altering the true mileage violates federal and state statutes.  With little time and expense these vehicles are then cosmetically refurbished ("detailed") so as to appear to be desirous, low mileage cars.  One-time lease cars make easy targets because they are generally leased for only a few years before being sold.  These recent model vehicles, apparently well-maintained, have an appearance which is compatible with the lower, altered mileages.

No major study of odometer fraud involving lease cars has been conducted since the 1985 study by the Illinois Attorney General.  That study found a 49.8% tampering rate among the cars it tracked into twenty-three (23) states.  New statistics were needed to determine the current extent of the odometer tampering problem.

-2-

## OBJECTIVES

There were two objectives for this study. The primary objective was to determine the current level of odometer tampering in one-time lease vehicles. A secondary objective was to replicate as closely as possible the 1985 Illinois study and to compare results of the two studies.

## METHODOLOGY

The Pennsylvania Office of Attorney General was awarded a contract by NHTSA to study odometer tampering of one-time lease vehicles. In order to obtain a sufficiently large sample for the study, three large lease car companies were selected. NHTSA issued administrative subpoenas to Wheels, Inc., of Chicago, Illinois; Automotive Rentals, Inc. (ARI), of Mt. Laurel, New Jersey; and United States Fleet Leasing, Inc. (USFL), of San Mateo, California. The subpoenas required the submission of computer tapes that contained the model year, make, vehicle identification number (VIN), date of sale, place of sale and odometer reading at the time of sale for all vehicles sold from January 1, 1991 through June 30, 1991. Wheels submitted a tape with 26,036 records. ARI submitted a tape with 23,193 records. Both tapes included records from all jurisdictions.

-3-

USFL responded that it was unable to comply with the subpoena because the company did not have the required information on an automated system. NHTSA later determined that USFL's fleet was much smaller than anticipated and that 40% of its business was in California. Enforcement of this subpoena was not pursued because the USFL information was geographically skewed and thus not appropriate for the study.

In addition to the information required by the subpoena, Wheels submitted data disclosing whether its vehicles were sold through auction, sold directly to dealers, or sold directly to lessees. NHTSA placed the information from Wheels and ARI into separate databases. All records that did not contain an odometer reading were removed. 449 records were removed from the Wheels database leaving a total of 25,587 usable records. 616 records were removed from the ARI database leaving a total of 22,577 usable records.[2] NHTSA's computer then selected every eleventh record and placed them into two new databases.

---

[2] Since approximately 2% of the records were removed from the database due to missing odometer information in the subpoenaed files, it is possible that these missing records would have represented a higher tampering rate than that apparent from the overall study. For purposes of this study it has been assumed that these records are missing at random and would have disclosed the same tampering rate as those records which were submitted.

-4-

These databases consisted of 2,319 Wheels vehicles representing all jurisdictions except Hawaii, Vermont and Wyoming, and 2,049 ARI vehicles representing all jurisdictions except Alaska, for a total of 4,368 vehicles selected for further review.

All vehicles sold to other leasing companies and all vehicles exempt from odometer disclosure requirements (over 16,000 GVWR or more than 10 years old) were then deleted. All vehicles sold in Puerto Rico were also removed because registration files in Puerto Rico are not available through the National Law Enforcement Telecommunications System ("NLETS"). NHTSA then performed an NLETS search to locate the current registered consumer owners of the remaining vehicles. Where NLETS data showed vehicles were sold to residents of Canada and Mexico, these vehicles were removed. [3] Any vehicles identified by NLETS as currently registered to other leasing companies, stolen, or salvaged were also removed from the database. If the NLETS response identified a vehicle as being titled to a dealer, the search continued to find the current registered consumer owner. If none could be identified, the dealer's state was

---

[3] It is possible that information in these deleted records would have represented a higher tampering rate than reported overall (see Footnote 2). For purposes of this study, however, it has been assumed that they would have disclosed the same tampering rate as those records used in the study.

-5-

entered into the database. In all other cases, the state of registration of the current consumer owner was put into the database. In addition, the type of initial purchaser (e.g. lessee or dealer) and whether the vehicle was sold through an auction was added for vehicles sold by Wheels. Since, in most cases, NLETS responses from Texas and Michigan listed the mileage at the time of issuance of new titles, these mileages were added to the database for vehicles retitled in those states.

Data regarding the last registered owners of 3,667 vehicles (1,933 Wheels; 1,734 ARI) or 83.9% of the initially selected vehicles remained. Computer files containing this information for these 3,667 vehicles was sent to the Pennsylvania Bureau of Consumer Protection, Philadelphia Regional Office ("Bureau"). These files were loaded into Microsoft Works, an integrated software package, for further input and analysis.

The study contains vehicles from all 50 states. Since only Texas and Michigan included mileage readings on the NLETS reports, the Bureau contacted the remaining 48 states and District of Columbia. Printouts containing VIN, year and make together with a letter requesting odometer readings for the vehicles were forwarded to each state's motor vehicle department contact person. The number of record requests ranged from 1 for

-6-

Alaska and the District of Columbia to 359 for California.  The Bureau requested either title documents from which it could determine the odometer reading at time of transfer or a response indicating the most current odometer reading on file.  If a vehicle record was sent back with no odometer reading or some question as to the accuracy of the reading arose, the Bureau requested the state to provide a detailed title history.  As responses were received the odometer readings were entered into the database and compared with the mileage at the time of original sale.  The computer then compared the two mileages in order to determine those cases where the new mileage was less than the original mileage, and thus a rollback.  Any difference of less than 5,000 miles was assumed to be a clerical error and was not counted as a rollback.  In 37 cases (15 ARI; 22 Wheels), the Bureau was unable to obtain a current odometer reading. These vehicles were dropped from the study leaving a total of 3,630 vehicles.

<u>RESULTS</u>

A.  <u>OVERALL TAMPERING RATE</u>

Based on an analysis of the leased vehicles resold by the two lease companies, the overall nationwide tampering rate was estimated to be 5.07% or 184 of the 3,630 vehicles which were

-7-

studied. [4]   This is a very substantial reduction in the overall tampering rate from that found in the 1985 Illinois study. Individual statistics were tabulated for all 50 states and the District of Columbia as to where clocked vehicles were ultimately titled to consumer purchasers. The results are listed in Table 1 on page 10. The table discloses where the consumer victims are located, not necessarily where the actual tampering occurred. The data shows that several states experienced no rollbacks. New York's rollback rate of 22.43% was the highest, followed by Arkansas' rollback rate of 17.14%. [5]

Due to the low sample size of some states, the individual rollback statistics for those states are subject to a higher degree of sampling error. However, using the formula in Appendix $A'$, the estimated rollback rate (5.07%) for a sample size of 3,630 has a relative sampling error of 6.84%. Thus,

---

[4]   This rollback rate and extrapolations derived from it are based solely on the data sample from two lease companies, ARI and Wheels. Generalization to the entire population of lease vehicles can only be made under the assumption that these two companies are representative of the experience of the United States as a whole.

[5]   Wyoming had a 25% rollback rate. However, this was based on only a total of 4 vehicles in the study.

-8-

there is a 95% chance that the actual rollback rate is between 4.39% and 5.75%. 100 or 5.8% of the 1,719 total ARI vehicles were clocked while only 84 or 4.4% of the 1,911 total Wheels cars experienced tampering. However, a statistical comparison using the Chi Square test shows that any differences between ARI and Wheels are statistically insignificant. [6]

The average starting mileage on vehicles which were later rolled back was 89,119. The average number of miles that these vehicles were rolled back was 53,123 miles. The average mileage at which clocked vehicles were resold to consumers was 35,996. The total number of miles cut from the 184 tampered vehicles was 9,774,632. Extrapolating to all of the 49,229 Wheels and ARI vehicles sold during the six month time period, 2,496 vehicles were clocked a total of 132,595,008 miles.

---

[6] Chi Square = 3.664; Degrees of Freedom = 1; not significant at the .05 level.

-9-

TABLE 1: <u>Summary of Odometer Tampering for All Vehicles by State</u>
<u>Where Vehicle Titled to Consumer</u>

| STATE | NUMBER OF VEHICLES | PERCENT OF STUDY | NUMBER ROLLED BACK | PERCENT ROLLED BACK |
|---|---|---|---|---|
| Alabama | 70 | 1.93% | 1 | 1.43% |
| Alaska | 1 | 0.03% | 0 | 0.00% |
| Arizona | 25 | 0.69% | 1 | 4.00% |
| Arkansas | 70 | 1.93% | 12 | 17.14% |
| California | 339 | 9.35% | 16 | 4.72% |
| Colorado | 45 | 1.24% | 0 | 0.00% |
| Connecticut | 35 | 0.96% | 0 | 0.00% |
| Delaware | 7 | 0.19% | 0 | 0.00% |
| Florida | 124 | 3.42% | 1 | 0.81% |
| Georgia | 85 | 2.34% | 0 | 0.00% |
| Hawaii | 4 | 0.11% | 0 | 0.00% |
| Idaho | 12 | 0.33% | 0 | 0.00% |
| Illinois | 162 | 4.47% | 11 | 6.79% |
| Indiana | 132 | 3.64% | 2 | 1.52% |
| Iowa | 67 | 1.85% | 5 | 7.46% |
| Kansas | 39 | 1.08% | 0 | 0.00% |
| Kentucky | 68 | 1.87% | 0 | 0.00% |
| Louisiana | 40 | 1.10% | 4 | 10.00% |
| Maine | 9 | 0.25% | 0 | 0.00% |
| Maryland | 35 | 0.96% | 2 | 5.71% |
| Massachusetts | 59 | 1.63% | 0 | 0.00% |
| Michigan | 113 | 3.12% | 0 | 0.00% |
| Minnesota | 121 | 3.34% | 4 | 3.31% |
| Mississippi | 77 | 2.12% | 5 | 6.49% |
| Missouri | 115 | 3.17% | 2 | 1.74% |
| Montana | 5 | 0.14% | 0 | 0.00% |
| Nebraska | 55 | 1.52% | 1 | 1.82% |
| Nevada | 9 | 0.25% | 1 | 11.11% |
| New Hampshire | 3 | 0.08% | 0 | 0.00% |
| New Jersey | 112 | 3.09% | 12 | 10.71% |
| New Mexico | 23 | 0.63% | 2 | 8.70% |
| New York | 214 | 5.90% | 48 | 22.43% |
| North Carolina | 94 | 2.59% | 2 | 2.13% |
| North Dakota | 8 | 0.22% | 0 | 0.00% |
| Ohio | 161 | 4.44% | 7 | 4.35% |
| Oklahoma | 39 | 1.08% | 4 | 10.26% |
| Oregon | 40 | 1.10% | 4 | 10.00% |
| Pennsylvania | 234 | 6.45% | 6 | 2.56% |
| Rhode Island | 18 | 0.50% | 0 | 0.00% |
| South Carolina | 34 | 0.94% | 0 | 0.00% |
| South Dakota | 22 | 0.61% | 0 | 0.00% |
| Tennessee | 75 | 2.07% | 1 | 1.33% |
| Texas | 296 | 8.16% | 19 | 6.42% |
| Utah | 38 | 1.05% | 2 | 5.26% |
| Vermont | 1 | 0.03% | 0 | 0.00% |
| Virginia | 70 | 1.93% | 4 | 5.71% |
| Washington | 80 | 2.21% | 1 | 1.25% |
| Washington D.C. | 1 | 0.03% | 0 | 0.00% |
| West Virginia | 42 | 1.16% | 3 | 7.14% |
| Wisconsin | 98 | 2.70% | 0 | 0.00% |
| Wyoming | 4 | 0.11% | 1 | 25.00% |

(See Footnote 5).

-10-

## B.   TAMPERING RATE AS A FUNCTION OF MILEAGE AND MODEL YEAR

Even those dealers predisposed to roll back vehicles would not tamper with vehicles where the actual mileage on them is already the optimum mileage for resale to consumers.  Therefore, a tampering analysis was done involving only those "high mileage" vehicles prone to tampering.  The Mileage Deduction Charts of Automotive Market Report, a respected industry publication attached as Appendix B, were used to define what is considered a "high mileage" vehicle and thus subject to tampering.  The March 6, 1991, issue was chosen since it is a date midway through the period (January 1, 1991 - June 30, 1991) during which the vehicles in the study were being sold by lease companies.  Vehicles were defined as "high mileage" when the Mileage Deduction Chart relating to "Medium, Standard and Intermediate cars" indicated that there was a reduction in wholesale selling price due to the combination of mileage and model year. [7]  Based on this definition, 3,357 vehicles (94.54%) were high mileage and 194 (5.46%) were not considered high mileage.  Of these high mileage vehicles, 181 or 5.39%

---

[7]  Only the 3,551 vehicles comprising the 1985 through 1990 model years were used in this analysis since the Mileage Deduction Charts do not include other model years.  For the reasons discussed in §D. infra, the actual dollar reduction in the wholesale selling price listed in the Mileage Deduction Chart is irrelevant to determining the actual dollar amount of damages incurred by ultimate consumer purchasers.

-11-

experienced tampering, while only 1 or .52% of those vehicles
not classified as high mileage were rolled back. Based upon the
fact that only a negligible number of other than high mileage
vehicles were rolled back, the 5.39% tampering rate for high
mileage vehicles would seem to be the relevant rate for
determining the extent of the current lease vehicle tampering
problem.

C.    TAMPERING RATE BASED ON METHOD OF SALE BY LEASE VEHICLE
      COMPANY

Wheels, Inc. submitted data that disclosed whether or not
its vehicles were sold through an auction. With regard to the
1,911 Wheels vehicles studied, the tampering rate as a factor of
whether a vehicle was sold through an auction is summarized in
Table 2.

Table 2:  Tampering Rate As Factor of Lease Vehicle Company
Disposal Method

| DISPOSAL METHOD | NO. ROLLED BACK | % ROLLED BACK |
|---|---|---|
| Auction | 44 | 4.9% |
| Other than Auction | 40 | 4.0% |

-12-

A Chi Square test on the data in Table 2 shows that any differences between whether vehicles were sold through an auction or not are statistically insignificant. [8]

## D. MONETARY DAMAGE TO CONSUMERS

The per mile deductions from the wholesale selling price stated in industry publications such as <u>Automotive Market Report</u> (Appendix B) and <u>Galves Auto Price List</u> (Appendix C) are not an accurate measure of actual consumer loss. These figures reflect wholesale, not retail, prices and are intended to compare accurate mileages for vehicles whose odometers have not been altered. Many consumers and dealers have told the Pennsylvania Bureau of Consumer Protection and NHTSA odometer fraud investigators that they simply would not knowingly purchase a rolled back vehicle regardless of price. Therefore, the proper measure of damages would often be the entire price the consumer paid for the car.

---

[8] Chi Square = .7251; Degrees of Freedom = 1; not significant at the .05 level.

-13-

In those cases where a clocked car has some diminished value to a consumer, one must take into account a number of factors in computing the consumer's overall loss. Based on the average rollback rate of 53,123 miles found in this study, and based on the Automotive Market Report's $.06 per mile high mileage wholesale price deduction for full sized cars, the initial element of consumer damage is $3,187. Based on another respected industry publication, Galves Auto Price List, the wholesale deduction for high mileage full size vehicles is $.10 per mile. [9] In the case of a 53,123 mile rollback, the initial element of consumer damage would be $5,312. NHTSA believes and various federal courts have held that the higher Galves wholesale deduction more accurately reflects the actual loss a retail consumer suffers.

Forty-five states impose a sales tax and most consumers finance their motor vehicle purchase. Those consumers pay sales tax and installment sale finance charges on the higher price of a used car caused by the false odometer reading. Also, in some states, consumers must pay a yearly property tax on motor vehicles which is based in part on the purchase price of the

---

[9] Galves Auto Price List, July 26, 1991, recommends $100 deduction per extra 1,000 miles for full size and larger cars. Definition of high mileage vehicle is similar to that of Automotive Market Report.

-14-

car.   Predicated upon a 6% sales tax and a 15% APR finance charge, the additional tax and interest paid on the $5,312 portion of the purchase price attributed to mileage tampering is $1,116.  This figure does not take into account the property tax consequences to consumers in some jurisdictions.

Frequently, owners of vehicles with high mileage do not insure them for collision damage, while owners of more valuable lower mileage cars do carry such insurance.  The false low mileage reading thus leads owners to pay more for insurance than they would if they knew the vehicles' actual mileage.  A conservative estimate of average annual collision damage premiums nationwide is $225.  Assuming only 25% of the vehicle owners would choose not to carry collision coverage if they knew their vehicle was clocked, the overall additional insurance payment per rolled back vehicle would still be $225 over a four year ownership period.

The difference in the purchase price of low and high mileage cars theoretically reflects, among other things, anticipated repair costs to vehicles with higher mileages.  However, as a practical matter many high mileage vehicles incur expensive mechanical problems which are not reflected in purchase price differentials.  Owners of these high mileage vehicles often must

-15-

pay substantial repair costs to maintain their vehicles that are not accounted for in the high mileage selling price deduction.

In addition to the actual cost of repairs, consumers suffer a loss of time associated with breakdowns and dealing with service personnel. They may also spend considerable amounts of time attempting to resolve the problems that arise with the seller if they realize they have purchased a clocked car. The costs of this lost time are real and often include lost wages.

Not all consumer damage can be monetarily measured. Because many parts of a vehicle wear out with use and mileage, rather than with years, there are dangers involved in not knowing the correct mileage of a motor vehicle. The brakes, front end suspension, steering, and drive train are particularly subject to failure as the result of high mileage. Because consumers with clocked cars are unaware of the true mileage on their vehicles, they are less likely than people with accurate odometers to have safety checks and maintenance performed that they normally would have had performed if they had only known the true mileage of the vehicle. This may lead to sudden mechanical failures which cause serious injury or death.

-16-

Table 3    <u>Consumer Loss Due to Odometer Tampering:</u>

|  | Element | Amount |
|---|---|---|
| A. | Mileage Deduction ($.10/mile based on 53,123 miles) | $ 5,312 |
| B. | Excess Sales Tax | $ 319 |
| C. | Excess Finance Charges | $ 797 |
| D. | Collision Insurance | $ 225 |
| E. | Excess Repair Costs | Unknown |
| F. | Lost Time & Wages | Unknown |
| G. | Physical Injury | Difficult to Quantify |
| Total (Elements A - D only) | | $ 6,653 |

Estimates of the various elements of consumer loss resulting from odometer tampering are summarized below in Table 3. Estimates including these elements have been submitted by probation officers as part of pre-sentencing reports and have been accepted and used by federal courts in fashioning appropriate sentences.  Some of these elements are subjective and may not pertain to all consumers.

The extrapolated consumer loss based on a 5.07% tampering rate for all Wheels and ARI vehicles sold during the six month period of the study is $18,668,318.

-17-

E.  COMPARISON TO 1985 STUDY


One of the objectives of this study was to compare this study's statistics to those of the 1985 study done by the Illinois Attorney General.  The 1985 study also used vehicles sold by Wheels, Inc.  However, it tracked them into only twenty-three (23) states, since at that time a larger search would have overburdened the NLETS network.  To make the comparison relevant, only those vehicles from Wheels which were retitled in the same twenty-three (23) states were used.

The rollback rate for the 1,023 Wheels vehicles located in the relevant twenty-three (23) states was 3.91%.  This compares with the overall Wheels tampering rate of 4.4%.  It is even lower than the overall current study tampering rate of 5.08% and a substantial reduction from the 49.8% tampering rate found in 1985 when Illinois conducted an identical study.

Table 4 below illustrates the statistics from the 1985 Illinois study and the corresponding results from this study. While individual state figures are subject to a high degree of sampling error due to the low number of records in each state, the overall estimated rollback rate for this group of states has relative sampling error of 14.77%.  A comparison of high mileage vehicles between the two studies is not possible since no breakdown was performed in the 1985 study based on that classification.

-18-

Table 4:    Statistical Comparison of 1985 and 1992 Studies

| STATE | NUMBER OF VEHICLES | | PERCENT OF STUDY | | NUMBER ROLLED BACK | | PERCENT ROLLED BACK | |
|---|---|---|---|---|---|---|---|---|
| | 1985 | 1992 | 1985 | 1992 | 1985 | 1992 | 1985 | 1992 |
| Alabama | 45 | 40 | 2.3% | 3.73% | 24 | 0 | 53.3% | 0.00% |
| Arkansas | 64 | 28 | 3.3% | 2.61% | 33 | 3 | 51.6% | 10.71% |
| Delaware | 5 | 3 | 0.2% | 0.28% | 1 | 0 | 20.0% | 0.00% |
| Florida | 93 | 62 | 4.8% | 5.78% | 30 | 1 | 32.3% | 1.61% |
| Georgia | 114 | 46 | 5.9% | 4.29% | 22 | 0 | 19.3% | 0.00% |
| Illinois | 128 | 92 | 6.6% | 8.57% | 23 | 6 | 18.0% | 6.52% |
| Indiana | 116 | 86 | 6.0% | 8.01% | 37 | 1 | 31.9% | 1.16% |
| Kentucky | 374 | 41 | 19.3% | 3.82% | 292 | 0 | 78.1% | 0.00% |
| Louisiana | 71 | 22 | 3.7% | 2.05% | 31 | 3 | 43.7% | 13.64% |
| Maine | 114 | 6 | 5.9% | 0.56% | 32 | 0 | 28.1% | 0.00% |
| Maryland | 50 | 17 | 2.6% | 1.58% | 13 | 1 | 26.0% | 5.88% |
| Massachusetts | 10 | 26 | 0.5% | 2.42% | 1 | 0 | 10.0% | 0.00% |
| Michigan | 102 | 44 | 5.3% | 4.10% | 17 | 0 | 16.7% | 0.00% |
| Mississippi | 2 | 50 | 0.1% | 4.66% | 1 | 3 | 50.0% | 6.00% |
| New Hampshire | 159 | 2 | 8.2% | 0.19% | 36 | 0 | 22.6% | 0.00% |
| New York | 16 | 96 | 0.8% | 8.95% | 1 | 15 | 6.3% | 15.63% |
| North Carolina | 256 | 59 | 13.2% | 5.50% | 110 | 1 | 43.0% | 1.69% |
| Ohio | 133 | 98 | 6.9% | 9.13% | 70 | 2 | 52.6% | 2.04% |
| Pennsylvania | 154 | 111 | 7.9% | 10.34% | 79 | 4 | 51.3% | 3.60% |
| South Carolina | 63 | 18 | 3.3% | 1.68% | 13 | 0 | 20.6% | 0.00% |
| Tennessee | 152 | 44 | 7.9% | 4.10% | 57 | 0 | 37.5% | 2.27% |
| West Virginia | 66 | 31 | 3.4% | 2.89% | 8 | 1 | 12.1% | 3.23% |
| Wisconsin | 26 | 51 | 1.3% | 4.75% | 13 | 0 | 50.0% | 0.00% |

## CONCLUSIONS AND RECOMMENDATIONS

The overall odometer tampering rate for vehicles after they are sold by lease companies appears to have greatly decreased since 1985. This is probably a result of both the enactment of TIMA and increased federal and state criminal enforcement actions. TIMA and attendant regulations are now fully in effect in all states except California. [10] TIMA requires that state vehicle titles contain an odometer statement completed by buyer and seller which certifies the accuracy or inaccuracy of the odometer reading. Separate odometer statements must be provided by lessees to lessors. Odometer readings reported at the time of transfer must then be recorded on subsequent vehicle titles. Vehicle auctions are also required to keep records of odometer readings for vehicles sold through them.

Using paper trails created by TIMA and similar state legislation, federal and state prosecutors have brought an increased number of high media profile criminal actions which have resulted in substantial prison sentences and fines. From the study results, it would appear that these efforts have been partially successful - at least with regard to lease vehicles.

---

[10] California has been given a waiver from compliance by NHTSA until January 1, 1994.

However, anecdotal evidence from odometer investigators and industry members strongly suggests that the overall tampering problem remains high. Some suggest that due to the scrutiny given former lease cars, clockers have found other sources of cars to rollback. These sources include repossessed vehicles and high mileage cars traded-in to retail dealers which are sold directly to wholesalers and not through an auction. Such vehicles are more difficult to track and often avoid the scrutiny of odometer fraud investigators. For this reason one cannot extrapolate the results of this study to the overall odometer tampering problem.

Odometer tampering remains a very lucrative crime. At the wholesale level based on a $.06 per mile high mileage deduction, a clocker can artificially increase the value of this study's average 89,119 mile clocked car by $3,187 by rolling back the odometer to 35,996 miles. (See Appendix B). The temptation is obvious. Therefore, continued high profile criminal prosecutions must continue in order to keep the problem in remission. Another important source of deterrence is private civil actions brought on behalf of consumers by an expanding and increasingly aggressive cadre of attorneys who specialize in odometer tampering cases. Typically these attorneys bring federal civil actions against new and used retail dealers who,

-21-

while usually not the actual clockers, purchase tampered vehicles from wholesale dealers and resell them to consumers. Such actions can seriously damage the reputation of a retail dealership and result in tens of thousands of dollars in damages and attorneys fees. These actions are forcing retail dealers to more carefully examine the cars they purchase and the reputation of the dealers from whom they buy them.

As noted above, 5.46% of the vehicles coming off lease were not considered by the industry as having high mileage. Since the average fleet car logs 32,000 miles per year, it is possible that some of these business use vehicles may have actually been driven more than 15,000 miles per year. An article in Automotive Fleet [11] notes that in order to lower monthly lease payments, lease companies have recently lengthened lease terms. Then to keep the residual value of the vehicle high, the lessors have unrealistically lowered yearly mileage limits to about 15,000 miles and assessed lessees a penalty of up to a $.10 per extra mile. Faced with an excess mileage fee at lease termination of $2,000 or more, some lessees may be tempted to tamper with their odometers by unhooking them, installing a gear reducer ("halfer") or rolling them back. The

---

[11] Automotive Fleet, October, 1991, p. 53.

-22-

Automotive Fleet article cites anecdotal evidence of wholesalers that "it is typically the self-employed businessperson or manufacturer's representative who would personally bear the consequences of turning in a high mileage vehicle that is prone to entertaining the idea of 'clocking' an odometer."[12]

TIMA requires that lessees provide lessors with an odometer statement when the lease terminates certifying the mileage and whether it is accurate. False certification by lessees is a federal felony and also subjects them to private civil actions for substantial damages. Lessors should increase efforts to educate lessees at the inception of a lease concerning the serious consequences of false certification. This should be followed up by making highly publicized examples of several lessee clockers. Ideally, this should be a criminal case filed by the government. But in most cases the government does not have the resources to prosecute individual lessees. Where a lessor receives evidence that a vehicle taken in off lease was clocked by a lessor, it should bring a private civil action seeking treble damages and attorney's fees. Awards in such cases are often large. The problem should also be attacked at its source. If the industry ceased writing leases with

---

[12] Id. at p. 54.

-23-

unrealistic mileage caps, there would be little incentive for lessees to clock their vehicles.

A serious impediment to uncovering odometer fraud both by government prosecutors, honest dealers and private citizens remains. Currently, there is no practical method for a consumer, dealer, or prosecutor to quickly check the odometer history on a vehicle. Clockers wash titles through fictitious straw parties and several states in order to cover the trail of their wrongdoing. Currently, the fraud must be uncovered through the time-consuming and lengthy process of tracing a title history from state to state. Because it takes so long, it is not practical when buying a vehicle. Even when a later check uncovers the fraud, it is often too late to resolve the problem or catch the perpetrator. A national database of vehicle identification numbers that includes prior odometer readings as well as theft data and prior salvage status would provide an excellent tool to honest dealers, auto auctions, consumers and law enforcement. The ready availability of such information would also act as a strong deterrent to those who would clock cars. A recently enacted federal law, the Anti-Car Theft Act of 1992, creates such a database effective January, 1996, and establishes a Task Force to study problems regarding uniform state titling procedures.

-24-

## APPENDIX A

| ROLLBACK RATE | SAMPLE SIZE NEEDED TO OBTAIN A GIVEN RELATIVE STANDARD ERROR FOR DIFFERENT ROLLBACK RATES | | | | |
|---|---|---|---|---|---|
| .01 | 39600 | 9900 | 4400 | 2475 | 1584 |
| .02 | 19600 | 4900 | 2178 | 1225 | 784 |
| .03 | 12933 | 3233 | 1437 | 808 | 517 |
| .04 | 9600 | 2400 | 1067 | 600 | 384 |
| .05 | 7600 | 1900 | 844 | 475 | 304 |
| .06 | 6267 | 1567 | 696 | 392 | 251 |
| .07 | 5314 | 1329 | 590 | 332 | 213 |
| .08 | 4600 | 1150 | 511 | 287 | 184 |
| .09 | 4044 | 1011 | 449 | 253 | 162 |
| .10 | 3600 | 900 | 400 | 225 | 144 |
| .15 | 2267 | 567 | 252 | 142 | 91 |
| .20 | 1600 | 400 | 178 | 100 | 64 |
| .25 | 1200 | 300 | 133 | 75 | 48 |
| .30 | 933 | 233 | 104 | 58 | 37 |
| .35 | 743 | 186 | 83 | 46 | 30 |
| .40 | 600 | 150 | 67 | 37 | 24 |
| .45 | 489 | 122 | 54 | 31 | 20 |
| .50 | 400 | 100 | 44 | 25 | 16 |
| | .05 | .10 | .15 | .20 | .25 |

DESIRED RELATIVE ERROR OF ROLLBACK RATE
(normalized to mean rollback rate)

Formula:

$$N = \frac{1-p}{p \times sigma}$$

Where  N      is the size of the sample.
       p      is the probability of success
              (i.e., that a given vehicle has had an
              odometer rollback), and
       sigma  is the standard deviation of the number
              of rollbacks in the sample divided by
              the expected number of rollbacks.

APPENDIX B

# MILEAGE DEDUCTION CHARTS

The following charts reflect suggested deductions for excess mileage. Chart 1 applies to Medium, Standard and Intermediate size cars, and Chart 2 is for Luxury, Compact and Sub-compact models.

### CHART 1 - MEDIUM, STANDARD, AND INTERMEDIATE CARS.

|                  | 1990 | 1989 | 1988 | 1987 | 1986 | 1985 |
|------------------|------|------|------|------|------|------|
| To 15,000        |      |      |      |      |      |      |
| 15,000-20,000    | 100  |      |      |      |      |      |
| 20,000-25,000    | 300  |      |      |      |      |      |
| 25,000-30,000    | 500  | 100  |      |      |      |      |
| 30,000-35,000    | 700  | 300  | 100  |      |      |      |
| 35,000-40,000    | 1000 | 500  | 300  |      |      |      |
| 40,000-45,000    | 1300 | 800  | 500  | 50   |      |      |
| 45,000-50,000    | 1600 | 1100 | 800  | 250  |      |      |
| 50,000-55,000    | 1900 | 1400 | 1100 | 450  | 50   |      |
| 55,000-60,000    | 2100 | 1700 | 1400 | 650  | 250  |      |
| 60,000-65,000    | 2500 | 2000 | 1700 | 850  | 450  | 50   |
| 65,000-70,000    | 2800 | 2300 | 1900 | 1150 | 650  | 250  |
| 70,000-75,000    | 3100 | 2600 | 2200 | 1450 | 850  | 450  |
| 75,000-80,000    | 3400 | 2900 | 2500 | 1750 | 1150 | 650  |
| 80,000-85,000    | 3700 | 3200 | 2800 | 2050 | 1450 | 850  |
| 85,000-90,000    | 4000 | 3500 | 3100 | 2350 | 1750 | 1150 |
| 90,000-95,000    | 4300 | 3800 | 3400 | 2650 | 2050 | 1450 |
| 95,000-100,000   | 4600 | 4100 | 3700 | 2950 | 2350 | 1750 |

### CHART 2 - LUXURY, COMPACT, AND SUB-COMPACT CARS.

|                  | 1990 | 1989 | 1988 | 1987 | 1986 | 1985 |
|------------------|------|------|------|------|------|------|
| To 15,000        |      |      |      |      |      |      |
| 15,000-20,000    | 200  |      |      |      |      |      |
| 20,000-25,000    | 500  |      |      |      |      |      |
| 25,000-30,000    | 750  | 200  |      |      |      |      |
| 30,000-35,000    | 950  | 400  | 200  |      |      |      |
| 35,000-40,000    | 1200 | 700  | 400  |      |      |      |
| 40,000-45,000    | 1500 | 1000 | 600  | 150  |      |      |
| 45,000-50,000    | 1800 | 1300 | 900  | 350  |      |      |
| 50,000-55,000    | 2100 | 1500 | 1200 | 550  | 150  |      |
| 55,000-60,000    | 2400 | 1800 | 1500 | 750  | 350  | 50   |
| 60,000-65,000    | 2700 | 2100 | 1800 | 950  | 550  | 150  |
| 65,000-70,000    | 3000 | 2400 | 2000 | 1250 | 750  | 350  |
| 70,000-75,000    | 3300 | 2700 | 2300 | 1550 | 950  | 550  |
| 75,000-80,000    | 3600 | 3000 | 2600 | 1850 | 1250 | 750  |
| 80,000-85,000    | 3900 | 3300 | 2900 | 2150 | 1550 | 950  |
| 85,000-90,000    | 4200 | 3600 | 3200 | 2450 | 1850 | 1250 |
| 90,000-95,000    | 4500 | 3900 | 3500 | 2750 | 2150 | 1550 |
| 95,000-100,000   | 4800 | 4200 | 3800 | 3050 | 2450 | 1850 |

Beyond 100,000 miles, deduct $0.06 per mile, deduction not to exceed 85% of listed value.

EXCERPT FROM
AUTOMOTIVE MARKET REPORT - MARCH 6, 1991

APPENDIX C

**1986** V6 G/Prix RWD: DED 200 from V8 models below
| | | |
| --- | --- | --- |
| V8 Grand Prix | HT Coupe | 3100 |
| V8 Grand Prix LE | HT Coupe | 3300 |
| V8 Grand Prix Brghm | HT Coupe | 3400 |

| | | | | |
| --- | --- | --- | --- | --- |
| DED: w/o AT | 600 | ADD: PWind (others) | | 75 |
| DED: w/o PWind | 75 | ADD: 3 Seat Wgns | | 100 |
| DED: w/o TTop (T-AM) | 300 | ADD: Turbo (other S/Bd) | | 100 |
| DED: w/o Turbo (S/Bd GT) | 100 | ADD: LE (S/Bd,GrAM,6000) | | 150 |
| DED: w/o Wgrn (Wgns) | 100 | ADD: SE (GrAM, 6000) | | 250 |

### S A T U R N

**1991** AIR COND INCL BELOW; DED 800 W/O
| | | | |
| --- | --- | --- | --- |
| 4 Cyl SL | F69 | 4 Dr Sedan | |
| 4 Cyl SL1 | C69 | 4 Dr Sedan | |
| 4 Cyl SL2 DOHC | J69 | 4 Dr Sedan | |
| 4 Cyl SC DOHC | C27 | Coupe | |

| | | | |
| --- | --- | --- | --- |
| DED: w/o AT | 850 | ADD: PW | 200 |
| DED: w/o AC | 700 | ADD: ABS | 300 |

— — — — — —

## Average Mileage Chart

(Applies ONLY to American Cars)

NOTE: SINCE CONDITION IS AN IMPORTANT FACTOR, MILEAGE SHOULD BE CONSIDERED WITH DISCRETION IN DETERMINING VALUES, PARTICULARLY REGARDING OLDER MODELS.

| Models | 1991 | 1990 | 1989 | 1988 |
| --- | --- | --- | --- | --- |
| A & B | 8,000 | 20,000 | 32,000 | 43,000 |
| C & D | 6,000 | 18,000 | 30,000 | 41,000 |

1987 and OLDER models - - - **CONDITION**

DEDUCT (per 1000 extra miles) as follows:
(A) COMPACT models . . . . . . . . . . . $ 75
(B) INTERMEDIATE models . . . . . . . $ 85
(C) LARGER models . . . . . . . . . . . . . $100
(D) LUXURY models . . . . . . . . . . . . . $125

CONDITION AND MILEAGE ARE IMPORTANT FACTORS IN DETERMINING PRICE

VOL. XXXV        NO. 35

# AMERICAN USED CARS EDITION

### 1991 PRICES INCLUDED

GALVES AUTO PRICE LIST

M.C. GALVES INC.
and
GALVES AUTO PRICE LIST INC.
IS NOW LOCATED AT:

THE NJ AUTO WHOLESALE MALL
430 INDUSTRIAL AVE.
TETERBORO   NJ   07608
(201) 288-6800

## Price Guide for
## Week Starting
## July 26, 1991

PUBLISHED EVERY WEEK BY

### GALVES AUTO PRICE LIST, INC.